## Maren C. N. Christiansen et al., Adm'rs, v. Dunham Towing & Wrecking Co.

1. MASTER AND SERVANT—*Duty of Master as to Safety Devices.*— In a suit against a master to recover for injuries to a servant, a witness testified that a certain safety device should have been used in connection with the work being done by the servant. *Held,* that until it was shown that the device was in use in this State, that its use was known to the master or that it was a generally known safety device for the kind of work being prosecuted, questions as to whether it was in use in other parts of the world and whether it was easily obtainable were improper.

2. EVIDENCE—*A Stockholder Not a Competent Witness in a Suit Against a Corporation by an Administrator.*—A stockholder of a corporation is incompetent as a witness in a case where the adverse party brings suit against his corporation as administrator of a deceased person, and he can not be made competent by any assignment of his stock, made for the purpose of qualifying him.

3. SAME—*Exclusion of Witness on Account of Interest.*—A witness

should not be excluded on the ground of interest if the question of his interest is in doubt.

4.  PRACTICE—*Objections Should Be Specific.*—A general objection to the testimony of a witness as to a conversation with a person since deceased, is not sufficient to cover objections that afterward arise as to the materiality or propriety of some particular part of the conversation.

5.  APPELLATE COURT PRACTICE—*Reconsideration of a Question Once Decided.*—Where a second trial of a case is conducted in accordance with the holding of this court on appeal from the decision of the trial court on the first trial, this court will decline to re-examine the questions involved.

6.  INSTRUCTIONS—*In a Particular Case, Should Be Considered Together.*—Where, reading the instructions in a case together and treating them as related and as forming an entirety, the law applicable to the facts and circumstances of the case appears to have been given with substantial accuracy, fullness and fairness, objections to particular instructions can not be sustained.

**Trespass on the Case.**—Death from negligent act.   Appeal from the Superior Court of Cook County; the Hon. PHILIP STEIN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1897. Affirmed.   Opinion filed April 8, 1898.

GEORGE WILLARD and JOHN C. RICHBERG, attorneys for appellants.

GURLEY & WOOD, attorneys for appellee; FRANCIS W. WALKER, of counsel.

MR. PRESIDING JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

This cause, with the title reversed, was once before in this court (44 Ill. App. 523), and remanded for another trial upon grounds not affecting the merits of the controversy. Upon the last trial below the verdict was for the defendant, and the error assigned is that the Superior Court erred in overruling the plaintiff's motion for a new trial.

The action was brought to recover for the death of plaintiff's intestate, Hans Christiansen (who will hereinafter be called Christiansen), caused, as alleged, by the negligence of the defendant.

Whether error was committed by the trial court in the

Christiansen v. Dunham Towing & Wrecking Co.

exclusion or admission of evidence, or in the giving of certain of defendant's instructions, is all that is argued.

The defendant corporation was engaged, at the time in question, in raising, and getting afloat, the steamboat Tioga from the bottom of the Chicago river, to which it had sunk and where it rested partially submerged, and Christiansen was one of its employes engaged in the enterprise.

The sinking of the Tioga was occasioned by an explosion which occurred in her hold while she lay at her dock in the river, about twenty-four hours before the second explosion happened that caused Christiansen's death. Her aft deck was mostly blown off, and she was otherwise so injured as to cause her to leak and fill with water.

In order to raise her it was necessary to pump her out, and the work of so doing was begun on the morning following her sinking.

The work of pumping was carried on by pumps operated on board the tug Mosher, alongside of her. From the time of its arrival alongside, the tug was, through its captain, under the orders and control of one Johnson, the wrecking-master in charge of the work. At that time, Johnson was also a stockholder in the defendant corporation, and its chief engineer.

Christiansen was a regular employe of the defendant, for all kinds of work, and was assisting Johnson in the work then in hand. He was also a submarine diver by profession, and when working as such was paid a compensation additional to his monthly wages of seventy-five dollars.

Christiansen and Johnson worked together all the day, and until about nine o'clock in the evening, in the labor of freeing the boat from water and in stopping leaks. At about the last named hour a second explosion occurred in the hold of the Tioga, causing both Christiansen and Johnson to be burned, and the subsequent death of Christiansen.

Up to the time of the second explosion, it was not known what had caused the first one, although it is quite clear that Johnson suspected the presence of inflammable gases or vapors in the hold.

Constituting a part of the cargo was a large number of barrels of oil, some of which were broken or caused to leak by the first explosion, but it was not known by anybody except, probably, the shipper of them, until after the second explosion, that any of the barrels contained naphtha, or other volatile oils which produce vapor, that, when mixed in proper proportions with air, will catch fire if brought into contact with a flame. There was nothing in the marking of the barrels to indicate that any of them held naphtha, and the presence of naphtha of sufficient specific gravity to be unsafe or explosive, could not be told by looking at it either in a barrel or floating upon water; that could only be ascertained by testing the oil with an instrument.

It appears that neither Johnson nor Christiansen had any previous experience in the handling or treatment of oil, or oil gases or vapors, under any similar conditions, but it is strongly indicative that Johnson suspected the presence of danger from some such causes, from the fact that when he first boarded the Tioga he satisfied himself that the first explosion did not come from her boilers, and, knowing the presence of oil in floating barrels and loose on the water's surface, he experimented as to what effect would be produced by suspending a lighted common ship's lantern in the hold close to the water's surface.

This experiment he made secretly, from aboard the tug, and the lantern hung there for about an hour before and until the second explosion happened. Johnson, in his testimony, admits that he so suspended the lantern secretly after supper, in order " to see if it was safe so as not to hurt anybody." " I didn't know what was the cause of the first explosion—at that time I was satisfied it was not her boilers—and I didn't want to run any chance of having another one."

Owing to some unstopped leaks, as well as from other causes, the gain made by the pumps was slow, and along toward nine o'clock in the evening, it was discussed between Johnson and Christiansen whether they should go away

Christiansen v. Dunham Towing & Wrecking Co.

until morning, leaving the pumps at work, or should first make an effort to stop a troublesome leak in the fantail of the boat, which, from the difficulty of getting at, had not been patched although it was great enough to overcome about one-fifth of the capacity of the pumps. It was then dark, and the task of working in the water with oil and a large number of negro bodies, killed by the first explosion, floating about, was doubly gruesome, and considerable discussion ensued between Johnson and Christiansen as to which course to pursue.

The conclusion was to proceed, as advocated by Christiansen, to stop the leak before going home, and to that end the two men boarded the boat from the tug, Johnson carrying in his hand a lighted ship's lantern, and walked aft along a shelf-piece about three feet wide that formed a part of the original deck and remained in place after the explosion, to a part of the deck that was left at the stern, under which and below the inside water level, the leak had been previously located. Some conversation then ensued between the two as to which one should go down into the hold underneath what remained of the after part of the deck and find the leak, and also of the possible danger of gases being collected in that part of the hold under the deck. Before that time, Christiansen had seen and spoken with Johnson about the lighted lantern that hung in the forward part of the aft hold, and, so far as appears, he knew as much about the presence of dangerous gases in the hold as Johnson or anybody else did. It was, however, arranged that Johnson should hold the lantern, and that Christiansen should go in under the deck, and for that purpose, while Johnson stood at his side holding the lighted lantern, Christiansen sat down upon the edge either of the shelf-piece or the remaining part of the deck, to swing himself down into the hold, and at that instant the second explosion occurred, accompanied by flames around the men.

Christiansen was so badly burned that he died in consequence about a fortnight later.

Each count of the declaration averred in substance that

the day preceding the explosion which fatally burned Christiansen, an explosion of vapor or gas arising from oils had taken place on board of the Tioga, of which the defendant had notice, or, by the use of reasonable care, would have had notice, before beginning to pump out and raise the vessel, and negligence and breaches of duty by the defendant in the various particulars that would readily suggest themselves to the pleader, were appropriately averred in the several counts.

The ruling out by the court of two questions put by the plaintiffs to an expert witness called by them, constitutes the only error that is argued by the appellant as having been committed in the exclusion of offered testimony.

The witness had testified as to the qualities and characteristics of volatile oils and the vapors generated from them, and as to the ordinary precautions which should be observed by persons working in the presence of such loose oils, one of which was the use of a miner's safety lamp, otherwise known for many years as the "Davy lamp."

He was then asked whether or not "that lamp is in use, where gases are generated, in this State, particularly in mines?" and he answered that he did not know. Then followed another question, whether such lamps were "in general use in the city of Chicago before and at the time of this explosion?" and he again answered, he did not know.

Again he was asked whether he had seen the lamp spoken of, "here, or saw it prior to the time of this explosion, and whether you know or not it was in use at and prior to that time?" And his answer was: "I have seen some in New York, and here in Chicago before the great fire; before the fire of 1871. Whether or not they were used in mines in this State, I do not know."

In connection with the foregoing questions and answers, the questions that are contended to have been erroneously ruled out, were put as follows: "Is that lamp in general use where gases are being generated, and where men are at work operating?" and, "Do you know whether this lamp is easily obtainable, or not?"

The exclusion of answers to those questions was not error. The witness had already answered that he did not know whether or not such lamps were in general use in this State, or in the city of Chicago, and whether they were in general use in other parts of the world was not material, without, at least, having made it first appear that such use was known to the defendant.

As to the other question, it was immaterial whether or not such lamps were easily obtainable, without having first shown that they were in general use in this State, or were at least a generally known safety device for the kind of work being prosecuted.

Moreover, it was made clearly to appear upon cross-examination, that the witness had no personal knowledge of the use of the lamps except in a chemical laboratory, and it is well understood that error without injury will not cause a reversal.

Appellants say it was error by the court to exclude chapters 93 and 94 of the Revised Statutes of Illinois concerning mines and miners, but they neither argue the question, nor point out wherein such statutes, or any part of them, are applicable, and such chapters containing nearly sixty sections, we will not unaided, hunt to find out if there be in them any applicability to the case at bar.

A more serious question is presented concerning the competency of Johnson as a witness for the defendant.

At the time of the explosions he was a considerable stockholder in the defendant corporation, and was such when called as a witness by the plaintiff at the first trial; but on the evening of that day and before his cross-examination was begun, he transferred his stock at its face or par value to Captain Dunham, the president of defendant.

Shortly after the conclusion of that trial he received the stock back from Captain Dunham at its face value, and held it as his own until this court reversed that first judgment, and another trial of the cause became a matter in prospect. He then again in March, 1894, transferred the stock to Captain Dunham for $9,100, its par value, since which time,

as he testified, he has not owned, or been interested in any stock of the company.

As a stockholder, Johnson was incompetent as a witness in a cause brought by the plaintiffs as administrators against his corporation (Sec. 2, Ch. 51, entitled " Evidence "), and he could not be made competent by any assignment of his stock, made for the purpose of qualifying him. Sec. 7, same chapter.

Our inferences, drawn from the circumstances under which Johnson dealt with his stock, and from his testimony, are strong, that he assigned it for the purpose of making himself a competent witness for the defendant, but we hesitate to decide that the trial court, having heard and seen him testify, and being thereby better able to judge of his truthfulness than we are, erroneously admitted his testimony. Whether he was in law a competent witness, depended upon the fact of whether he was directly interested in the event of the suit, *i. e.*, whether he would gain or lose by the judgment sought, or, if, having been formerly so interested, he released or assigned his interest for the purpose of allowing himself to testify in the suit. The determination of such facts was the peculiar province of the trial judge, and his conclusion in respect thereof, upon the testimony of the witness examined upon his *voir dire*, should not be set aside except it is clearly wrong.

And in such particular, we are unable to say that error was so clearly committed as to justify our interference. It was, at best, a doubtful question, and " a witness will not be excluded on the ground of interest if the question of his interest is in doubt." Campbell v. Campbell, 130 Ill. 466.

Regarding the objection interposed to the testimony of Johnson, of conversations between himself and Christiansen, had just before the second explosion, it does not seem to be well taken. Upon the former appeal, this court, speaking through Mr. Justice Gary, said: " The conversation was a part of the transaction under investigation. The offer by the counsel of the appellant which accompanied the question, was, in effect, to show that the deceased was eager to

go into the steamer and take the chance of danger from taking a light. What the deceased then said was *res gestae;*" and held that the evidence was improperly excluded. The second trial having been conducted in conformity with our former holding in that respect, we see no occasion to re-examine the question.

The point, that the jurors were prejudiced against plaintiff's case by the improper allowance, as a part of the conversation between Johnson and Christiansen, of the question put to the former by the latter, as to how he relished " nigger soup," referring to the dead negroes and water and oil in the vessel's hold, does not seem to have any foundation. Besides, if it were prejudicial, some objection or motion should have been interposed to it, so as to obtain a specific ruling by the court upon its materiality or relevancy. Nothing but a general objection and exception, subject to which it was understood all the evidence of conversations should be allowed, was interposed. Such an objection was not enough to cover every objection that might afterward arise as to the materiality or propriety of some particular part of the conversation.

Nine of defendant's fifteen instructions are argued to have been erroneous. They are too lengthy to be set out here, but have severally received all the consideration, in connection with the arguments against them, that the importance of the case demands. Thus considered, and reading into them the instructions that are not complained of, and treating them all as related and forming an entirety, the law applicable to the facts and circumstances of the case, seems to have been laid down to the jury with substantial accuracy, fullness and fairness.

The law involved in the case is not new, but relates to proof of cause of action as laid in the declaration, duties of master to servant, conduct of either in the presence of unusual and unforeseen dangers, the use of defective implements, notice and assumption of risk, fellow-servants, subordinate and superior in authority, and negligence and contributory negligence, in their various aspects.

The law upon all of these questions has been substantially settled by numerous adjudications of our Supreme Court, and the chief difficulty found in any case that arises is in the correct application to be made of it to the case in hand. We think the instructions in the case at bar have in the main properly applied the law, and that the record is substantially free from material error. The judgment of the Superior Court is therefore affirmed.